Zel M. Fischer, Judge,
dissenting.
■ I respectfully dissent. Every attorney licensed to practice law in this state must first take an oath. The third paragraph of that oath provides, “That I will never seek to mislead the judge or jury by any artifice or false statement of fact or law[.]” Every attorney is reminded of this sacred promise, and is required to reaffirm it, each year when they sign their annual enrollment form. Sanford Krigel knowingly violated that oath and multiple rules of professional conduct as explained in the principal opinion. The principal opinion suspends Krigel but stays that suspension and places him on probation. In my view, Krigel’s actions — in misleading both opposing counsel and the circuit court — warrant suspension without leave to reapply for six months, at a minimum, but I would disbar him.
FACTS AND PROCEDURAL HISTORY
Adoption Option, Inc., is a Kansas nonprofit corporation that is a licensed child placement agency in Missouri. Its focus is *307 to aid infertile couples with adopting children. The founder of Adoption Option was Hillary Merryfield. She began working with the prospective adoptive couple in this case in January 2010. However, in March 2010, she first met with the biological mother. At that time, Merryfield recommended the biological mother meet with Krigel, after the biological mother’s parents requested an attorney referral. Mer-ryfield had worked with Krigel on numerous occasions involving adoption. Krigel had been working in adoption law for more than two decades.
Krigel met with, and agreed to represent, the biological mother on March 11, 2010. Krigel later admitted that he spent fewer than 10 hours on the case and was paid $22,000[1] in fees by the prospective adoptive parents. DHP Hearing Tr. 249, 328. At this meeting, - Krigel described that he would be using a passive strategy, as he described it, “to actively do nothing” to assist the father. Shortly after his representation of the biological mother began, Krigel was contacted by the father’s attorney, Jeffery Zimmerman, a business and real estate attorney. During their discussion on the telephone, Zimmerman made Krigel aware of his client’s concern about an adoption and was assured by Krigel that an adoption would not take place without the consent of the father. Zimmerman also recommended that the biological mother and father receive some counseling, outside the presence of their parents. Krigel recommended Merryfield, without disclosing that Merryfield had recommended the biological mother to Krigel, or that Merryfield was actively working with the biological mother in preparation of adoption.
At the meeting with Merryfield, the father expressed that he would not consent to an adoption. Despite this, Krigel was told by Merryfield that the father was very passive, and that Merryfield felt that, while he would not consent to adoption, he would not assert his rights and actively stop an adoption. Krigel’s next move was to terminate the biological mother’s parental rights só custody could be transferred to the prospective adoptive parents. This occurred- in a hearing on April 6, 2010. After this hearing, Krigel anticipated his representation of the biological mother would be complete. Aside from this one hearing, Krigel had spent 10 hours or less on the entire case.
Krigel’s passive strategy worked so well that — had the biological mother not made comments to a third party on Facebook— the father likely would not have found out about the birth of his child for months after it happened. When the father did find out about the birth, he was referred to Mike Whitsitt. ■ Whitsitt immediately filed paperwork to have the father placed on the putative father registry and filed a paternity action. Months and $50,000~$70,000 of attorney’s fees later, the father was awarded custody of his child.
DISCPLINE HEARING PANEL .FINDINGS AND CONCLUSIONS
The DHP made numerous factual findings and conclusions regarding Krigel’s conduct. The principal opinion acknowledges these findings and conclusions are supported by the record. Some of the *308 DHP’s findings and 'conclusions that are significant include: ■
25. Late in March 2010, the expectant mother sent the expectant father a message falsely' stating that her doctor had revised the due date from April 8 until May 1. The expectant father had been barred from attending the doctor appointments with the expectant mother and was deceived by her statement.
26. The baby was born on.April 3, 2010. Neither the father nor his attorney was notified of the birth. The father’s name was not shown on the birth certificate. The Panel finds the failure to notify, the father or his attorney was purposeful and based on legal advice provided by Respondent, and was designed to impair the father’s ability to assert his paternal -rights.
27. On April 6, 2010 a hearing was held in Jackson County, Missouri before Commissioner Merrigan, for the purpose of having the birth mother tender her consent to terminate her parental rights, preparatory to adoption proceedings being instituted. ’ Respondent appeared, on behalf of the mother. Neither the father nor his attorney received notice of the hearing and neither was aware of the birth of the child.
28. At the April 6, 2010 hearing, in response to Respondent’s questioning, the mother provided false testimony, stating that she had done nothing to defraud or mislead the father which was not true in light., of the fact she had given , him false ■information regarding the expected due date., Respondent testified to this Panel ■that .he, was not aware, that the mother . had provided .the father with a ,false, due date.
29. At the April 6 hearing, in response to Respondent’s question, the mother agreed that the father “had been consulted at length about the matter.” Respondent knew, that his “passive strategy7’ called for no communication following the initial counseling session with Ms. Merryfield and that his questioning suggested to the Court that there had been more consultation than was the case.
30. Respondent testified to this Panel that he knew the father believed the mother’s due date to be April 8. Having instructed his client not to communicate with the father, at the time of the April 6 hearing Respondent was aware that his strategy had prevented the father from knowing that the baby had been bom, and from coming forward in advance of the April 6 hearing. Respondent was also aware that the father had consistently asserted his paternity, expressed his desire to raise the child, and stated his opposition to adoption.
31. Nevertheless, at the April 6 hearing, in response to a question from Respondent, the mother agreed with Respondent’s statement that “even though you’ve talked to him and his family at some length, he has not stepped forward since the birth of the child claiming any rights to the child.” Respondent elicited this misleading testimony knowing that his “passive strategy” had ensured that the father would not know of'the’birth. Further, Respondent posed his question fully aware of the fact that the father had consistently' claimed 'rights to the child.
32..Respondent’s questioning-,of. the ■mother at, the April 6, 2010. hearing, while addressing certain statutory, elements, was designed to present to the Court the incorrect impression that the father was not interested in the birth of the child or in asserting his parental rights, when Respondent knew that was not the case. ■
*309 40. The Panel finds that Respondent employed his “passive strategy” for the express purpose of impairing the father’s ability to establish his parental rights under the Putative Father Registry or otherwise.
41. In conducting his examination of the birth mother at the April 6, 2010 hearing, Respondent asked questions designed to elicit answers that misrepresented the facts of the situation, - as known to Respondent, and that served to mislead the Court with respect to the true circumstances of the case, in violation -of Supreme Court Rule 4-3.3(a)(3).
42. In his telephone conversation with the father’s attorney, Mr. Zimmerman, Respondent'made a false statement that there would be no adoption without the father’s consent, in violation of Supreme Court Rule 4-4.1(a), and made no subsequent effort to advise the attorney otherwise.'
43. Under the circumstances of this case, and given Respondent’s clear understanding'as to the identity of the father, that the father was not willing to consent to án adoption, and that the father wanted to raise his child, Respondent’s conduct, including his conversation with Mr. Zimmerman, his instructions to the mother and her family to have no communication with the father, and his overall implementation of his “passive strategy” to “actively do nothing,” had no substantial purpose other than to impair and delay the father’s assertion of his parental rights in violation of Supreme Court Rule 4-4.4(a).
44. Respondent’s overall conduct in this matter, including his interaction, and failure to interact,, with the father’s counsel, the implementation of his “passive strategy,” and his conduct at the April 6, 2010 hearing, constituted conduct prejudicial to the administration of justice, in violation of Supreme Court Rule 4-8.4(d).
46. As-a result of Respondent’s misconduct, the father was largely denied access to his child for the first year of its life, and the father and his family incurred substantial expense in establishing his parental rights and preventing the child’s adoption.
DHP Decision at pp. 5-7, 8-9. The DHP recommended Krigel be suspended without leave to reapply for a period of six months. Neither the.DHP nor OCDC recommended probation and staying the suspension of Krigel’s license to practice law.
DISCUSSION AND DISCIPLINE
The most serious of Krigel’s violations is that of Rule ,4-3.3(a)(l). It provides: “A lawyer shall not knowingly: make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer.”
In addition to the factual findings and conclusions of the DHP, the circuit court’s judgment — which eventually removed the child from the prospective adoptive parents and placed custody with the father— in this case is equally enlightening. It begins with the following quotation: “The facts of this case shock the justice system that the people of Missouri enjoy. The Court finds the actions of officers of this Court- [referring to Krigel] to be at minimum disturbing to the administration of justice.” Further, the circuit court made additional findings that even provide a more complete picture of Krigel’s conduct. They include:
[The biological mother], through her attorney, Mr. Krigel, assured [the father], through Jeff Zimmerman, that no adoption would take place without [the father’s] consent, inducing him to forego protecting his parental rights under the *310 statute, to file with, the Putative Father Registry within fifteen (15) days after his child’s birth, or to file a paternity action. It was reasonable for [the father] to have believed that there was going to be no adoption.
[[Image here]]
In assessing the attorney’s fees the Court takes into consideration the following factors: ... (8) by the [proposed adoptive parents’] own testimony,' they have paid [Krigel’s fees of] Twenty Thousand Dollars ($20,000.00) for a minimal role in the litigation[.]
[[Image here]]
Just because the fraud practiced upon the natural father and this Court by the [biological] mother and the [prospective adoptive parents] does not fit neatly into one of the statutory exceptions does not mean this Court cannot remedy that fraud.
Judgment at 15-20. The circuit court described exactly what this situation was: a fraud on the circuit court that resulted in a father not receiving custody of his' child for in excess of a year, and Krigel receiving $22,000 “for a minimal role in the litigation.”
Here, the DHP found Krigel “asked questions designed to elicit answers that misrepresented the facts of the situation” and were used to mislead — and arguably intended to deceive — the circuit court. This, coupled with the “passive strategy” designed to mislead opposing counsel and the father, created a web of fraud entangling these entire proceedings,[2]
Accordingly; I agree with the portion of the principal opinion that states “Krigel’s most egregious act of misconduct was lack of candor toward the tribunal. Generally, ’when an attorney, with an intent to deceived the court, submits a false document, makes a false statement, or withholds material information, disbarment is the appropriate sanction.’ ” Principal, op. at 301 (quoting In re Caranchini,. 956 S.W.2d 910, 919 (Mo. banc 1997)). Violations of Rule 4-3.3(a) have traditionally resulted in disbarment or indefinite suspension. See In re Carey, 89, S.W,3d 477 (Mo. banc 2002) (attorneys that made misstatements of material fact to a court should be suspended indefinitely); In re Caranchiwi, 956 S.W.2d 910 (Mo. banc 1997) (attorney was disbarred for “falsely representing to the court that she lacked knowledge of a potential party’s change of residence and . ... that she could connect the testimony of work environment witnesses to her client.” Id. at 918.); In re Storment, 873 S.W.2d 227 (Mo. banc 1994) (attorney’s conduct warranted disbarment when he knowingly elicited false testimony from his client in order to deceive the circuit court).
In In re Oberhellmann, Elmer Oberhell-mann was charged with violating Rules 3.3(a)(1),(4); 5.5(a); 8.4(a), (c)-(d). 873 S,W.2d 851, 852 (Mo. banc 1994). The charges stemmed from Oberhellmann’s representation of two separate clients. Id. at 853. Oberhellmann represented the first client in a medical malpractice suit, filed under diversity jurisdiction in the United States District Court, Eastern District of Missouri. Id. When Oberhellmann *311 filed his complaint, he stated that his client was a resident of Texas. Id. Later, while answering interrogatories, Oberhellmann stated that his client lived at Oberhell-mann’s mother’s address in Illinois. Id. Eventually, the case was dismissed after the fraud was discovered. Id. The. misconduct involving the second client revolved around a soured law partnership. Id. at 854. Oberhellmann had been practicing with another attorney but later ended their association. Id. at 855. Afterward, Oberhellmann filed a motion to withdrawal his former partner from representation on a case that had already been settled. Id. In so doing, Oberhellmann forged his former partner’s name, and that forgery was later reported to the court by Oberhell-mann’s former partner. Id.
The Court in imposing its sanction held: In cases of false statements, fraud, or misrepresentation, this Court issues reprimands only if the lawyer is merely negligent in determining whether statements or documents are false. Respondent was more than negligent; therefore, public reprimand is not .appropriate. Nor is suspension appropriate. Suspension is appropriate only if a lawyer knows that a false statement is being submitted to a court and takes no remedial action. Disbarment is the appropriate sanction for respondent. Disbarment is appropriate when a lawyer, with the intent to deceive a court, makes a false statement' or submits a false document to a court.
Id. at 856 (internal citations omitted) (emphasis added).
The principal opinion turns an “about face” from this precedent in merely suspending Krigel, staying the suspension, and permitting Krigel to continue to practice on probation. That result does not protect the public nor the integrity of the legal profession. At a minimum, this Court’s case law, and the recommendation of the DHP, require Krigel be indefinitely suspended -with no leave to apply for reinstatement for six months, but my view is his actions warrant disbarment.

. The circuit court judgment states the prospective adoptive parents paid $20,000 in legal fees to Krigel for his representation of the biological mother. This amount seems to be calculated solely on the prospective parents’ testimony during proceedings before the circuit court; however, Krigel testified he received between $20,000-22,000 during his DHP testimony, resolving this discrepancy.

. As the principal opinion points out, the father asserted, from the outset, he wanted to raise his child, and the biological mother and her parents' initiated steps to prevent him from doing so. Principal Op. at 297. Further, from the outset Krigel had the father’s name and residence and knew the father would not consent to an adoption. Id. at 297. As soon as he became aware of the birth, the father retained new counsel with experience in adoption law, placed his name on the putative father registry, and intervened in the adoption proceedings.